IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs November 12, 2025

## STATE OF TENNESSEE v. MICHAEL THOMAS HUNTER, JR.

**Appeal from the Circuit Court for Montgomery County
No. 63CC1-2021-CR-406  Robert Bateman, Judge**

_____

### No. M2024-01610-CCA-R3-CD

_____

The Defendant, Michael Thomas Hunter, Jr., was convicted of six counts of aggravated sexual battery of a child less than thirteen years of age, a Class B felony, at a bench trial in the Montgomery County Circuit Court.  *See* T.C.A. § 39-13-504 (2018) (subsequently amended).  The trial court sentenced the Defendant to serve ten years at 100% for each offense, with five of the six sentences to be served consecutively.  The court also ordered community supervision for life and placement on the sexual offender registry.  On appeal, the Defendant contends that (1) the trial court erred in denying his motion to dismiss for violation of his right to a speedy trial, (2) the court erred in denying his motion to suppress his post-polygraph statements, (3) the evidence is insufficient to support his convictions, and (4) the court erred in sentencing him.  We affirm the judgments of the trial court but remand for the correction of a clerical error in the offense date on the judgment for Count 6.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed; Case Remanded

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

S. Tate Rohani (on appeal), Eric Yow (at trial), and Terria Blunt (at suppression hearing), Clarksville, Tennessee, for the appellant, Michael Thomas Hunter, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Robert J. Nash, District Attorney General; and Marianne Bell, Arthur Beiber and Crystal Morgan, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to his sexual abuse of his stepdaughter on five occasions in the period from January 1 to September 4, 2020, and an additional incident occurring between December 1, 2019, and September 4, 2020. The victim was ten and eleven years old during these periods. The incidents occurred in the family home when the victim's mother was at work.

The victim's mother testified that she married the Defendant in 2019 and divorced him in 2022 or 2023. The victim's mother described the Defendant as 6'2" and weighing "[t]hree fifty, over four hundred pounds." She said that she and her two daughters moved into an apartment in Nashville with the Defendant in Summer 2017. The victim was the older daughter. The victim's mother said that the Defendant brought structure to the family, verbally but did not physically discipline the children, and served as a father figure to the children. The victim's mother said that she, her children, and the Defendant moved to Montgomery County after living in the Nashville apartment for about a year and that the Defendant's daughter, who was the same age as the victim, visited their home on weekends and shared a bedroom with the victim's sister.

The victim's mother testified that, around the time the family moved to Montgomery County, the victim became "a little bit more reserved." The victim's mother said the victim had participated in counseling after the offenses.

The victim's mother testified that, in 2020, the Defendant picked up her daughters after school on Mondays and Tuesdays. She said the Defendant sometimes helped with transporting the victim to her grandmother's house for visits. The Defendant also provided childcare when the victim's mother was working.

The victim's mother testified that the Defendant called her on the night of September 3, 2020, and stated that the victim had been hiding the victim's sister's tablet. She said the Defendant found the tablet in the victim's bed. The victim's mother said she told the Defendant that she would "deal with" the victim when she got home but that she ultimately did not discipline the victim because she arrived home late. The victim's mother said that, when she was in the car with her daughters the next day, the younger daughter asked about her tablet, to which the victim's mother said they would "take care of that when we get home." The victim's mother said she dropped off the younger daughter at daycare and the victim at the victim's grandmother's house for the day.

The victim's mother testified that on the afternoon of September 4, 2020, she was driving to pick up her younger daughter at daycare when she received a call from a Department of Children's Services (DCS) worker. She said that she called the Defendant

and told him what the DCS worker had said and that he appeared shocked. She said that she did not pick up the victim and agreed that this had not been her choice. Other evidence showed that the victim remained at her biological grandmother's home for several days.

The victim's mother testified that, over the weekend, the Defendant made comments that she found disturbing. She said he stated, "Sometimes you got to let your kids go," to which she objected because the victim was eleven years old and a "baby." She said the Defendant mentioned that he was scheduled for police interviews on Wednesday and Friday. She said that, after a few days, she told the Defendant to leave the family home. She said he contacted her after his police interviews and told her that the victim "had came [sic] on to him" at least ten times by touching "[h]is private." She said the Defendant stated that he had not told her previously because "he didn't want to mess up our family." She said that she had never seen the victim acting inappropriately toward the Defendant but that she had seen them roughhousing. She said that she had admonished them to stop on one occasion and that the couch broke shortly thereafter.

The victim's mother testified that, to her knowledge, the victim did not have a boyfriend when the victim was age ten and eleven. The victim's mother said that the victim had eczema and psoriasis that was treated with lotion and medication and that the Defendant had known this.

The victim's mother testified that the Defendant suffered from some erectile dysfunction during their marriage and that he was only able to engage in intercourse if she fellated him.

The victim's mother acknowledged that the victim had been in trouble for stealing at school. The victim's mother agreed that the victim had been treated at a hospital for a "few hours" for "mental health challenges." She claimed not to know the circumstances that led to this treatment. She agreed that the victim had been "in trouble" at home for infractions such as not cleaning her room. The victim's mother acknowledged that she had administered corporal punishment to the victim but said it had been years earlier and she no longer recalled the details. She acknowledged that when she said she would "take care of" the situation involving the victim's having the younger daughter's tablet when the victim's mother got home, this would have referred to administering corporal punishment.

The victim, who was age fifteen at the time of the trial, testified that, on September 4, 2020, she disclosed to a paternal uncle that "bad things" had happened to her. She had been at her paternal grandmother's house at the time. She acknowledged that she had taken her sister's tablet a day or two earlier and had not yet been punished for it. She said she was nervous when she arrived at her paternal grandmother's house because she knew she was going to be punished later that day. She said the Defendant first discovered that she

had taken the tablet and gave her the choice of his telling her mother about the tablet or she could "suck his private." She said she had been at home sitting on the stairs, with the Defendant sitting on the living room couch, when this happened. She said no one else had been home at the time. She said that she refused to fellate the Defendant and that his demeanor changed to one of disappointment. She said that she asked him why he wanted her to perform the act if he had a wife and that he told her she was "right for questioning it" and said something else that she did not recall. She said the Defendant's request was a "step up from all the stuff he had asked" of her previously.

The victim testified that she asked her paternal grandmother if she could be punished at her grandmother's house for the tablet incident. The victim said that her grandmother took her outside onto the porch and that, "after a lot of badgering" from her grandmother about why the victim wanted to be punished at her grandmother's house, her grandmother asked something about "if he was touching [the victim]." The victim said she "burst into tears" and went into the living room.

The victim testified that she walked into the kitchen, where her uncle was on a telephone call, which she presumed was with 9-1-1. She said her uncle asked where the Defendant had touched her and that she told him "below the belt." The victim said that, a few minutes later, she went across the street to her maternal grandmother's home. She later returned to her paternal grandmother's home but did not recall if her uncle questioned her further after her return. The victim said she decided to disclose what had happened with the Defendant in order to protect her younger sister.

The victim agreed that she was interviewed at the Child Advocacy Center. A video recording of her September 18, 2020 forensic interview was received as an exhibit and played for the court.

The victim was then asked about incidents she mentioned on the video, and her testimony was consistent with the account she gave on the video. She agreed that, in approximately August 2020 after she had started "virtual school," she had thrown away uneaten food instead of saving it to be eaten later. She said that, as a consequence of having thrown away the food, the Defendant told her that either he would tell her mother or the victim she could "do the sexual stuff." She said that he made her sit beside him or on his leg and that he took her hand and guided it on his bare penis. She said he lowered his pants enough to expose his penis. She said the Defendant also touched her vagina over her pants on this occasion.

The victim testified that during Summer 2020 as she lay on her bed, the Defendant rubbed a substance that smelled like baby oil on her legs. She said he "made his way up" and "circle[d his finger] around" her "clit." She said her pants were off but she wore her

- 4 -

underwear. She said the Defendant touched her "butt" and tried to get her to remove her shirt so he could rub her chest but that she did not comply. She said the Defendant stood "towering over" her during this incident.

The victim testified that another incident occurred in Summer 2020 in her sister's room. She said the Defendant entered the room, stood over her as she sat near her sister's bed, and touched her vagina over her clothes. She said he had taken her hand and tried to get her to touch his penis but did not recall whether she touched his penis. She agreed that she had pushed or kicked the Defendant to get him away from her.

The victim testified that an incident occurred in 2020 when she was in fifth grade. She said that she lay on her bed in her room, and the Defendant entered the room and sat on the bed. She said he tried to get her to sit beside him and rub his penis and that she hit him and knocked off his glasses. She said the Defendant grabbed her wrists, held both wrists in one of his hands, and touched her vagina under her pants and on top of her underwear.

She said that another incident occurred in her mother and the Defendant's bedroom during Christmas break 2019, which she agreed had been the last couple of weeks of December. She said she had entered the bedroom because the Defendant called to her to come into the room. She agreed that the bed could be positioned to "sit up and watch TV" and that the Defendant had been sitting in bed in this manner. She said he repositioned himself with his legs off the bed, pulled down his pants, took her hand, and guided it along his "thing" under his clothes. She said the Defendant tried to get her to do this without his guidance and that she started crying. She said that a second incident of a similar nature occurred early in January 2020 in the same bedroom, during which she touched the Defendant's bare penis. She did not recall if the Defendant touched her during the second incident.

The victim agreed that the Defendant had been a father figure to her. She agreed that her mother had punished her by whipping her with a belt but that the Defendant never disciplined her in this manner. She agreed that if she had not disclosed the Defendant's actions on September 4, 2020, her mother would have "put her hands on" her that evening for taking the tablet.

The victim's uncle testified that he lived with his mother, whom other evidence showed was the victim's paternal grandmother. He said that the victim visited their home on weekends in 2019 and 2020. He said the victim's easy-going demeanor changed around elementary or middle school, with her "kind of . . . shutting down" and preferring to use his tablet over other activities outside the home. He said the victim began this withdrawal

about two years before March 2020. He said she wore hooded sweatshirts with the hood over her head "[a]ll the time."

The victim's uncle testified that the victim was upset upon arrival and cried intermittently after she arrived on September 4, 2020, at the home he shared with his mother. He said the victim asked shortly after arriving if she could live with him and her grandmother. She said she would prefer to be punished at their house. The victim's uncle stated that the three of them went outside and talked further. He said the victim cried for a while. When he eventually was preparing to leave for work, his mother told him that the victim had disclosed that she "had been touched." He said he approached the victim, who was sitting on a stool in the kitchen, and asked, "[D]id he touch you?" The victim's uncle stated that the victim responded affirmatively. He said that he asked the victim where she had been touched and that "she kind of pointed down to her private area." He said the victim stated that she could not "do this" and ran loudly crying to his mother's room.

The victim's uncle, who worked in a school, testified that he went to work after the victim's disclosure, where he spoke with a coworker about the situation. He said that the coworker notified the police and that he returned home. He said he spoke further with the victim, who assured him that she was telling the truth. He said the victim stated that the Defendant had been giving her choices between his telling the victim's mother about misbehavior or her touching his penis. He said the victim stated that the Defendant also "would feel the inside or outside of her pants." He described the victim as upset and crying. He said she reported that the incidents had been occurring "for a while."

Clarksville Police Detective Andrew Henry testified that, on September 4, 2020, he began an investigation related to the victim after a referral from DCS. Detective Henry agreed that the Defendant was first interviewed on September 9, 2020, and that the Defendant denied the allegations. Detective Henry agreed that the Defendant was interviewed a second time on September 11. Detective Henry said the Defendant was advised of his *Miranda* rights and waived them. Detective Henry said the Defendant was age forty-two and employed by the Davidson County Sheriff's Office at the time of the criminal conduct.

A video recording of the September 11, 2020 interview of the Defendant was received as an exhibit and played for the court. In the interview, the Defendant described playing with the victim, which involved her jumping and hanging on to him, and he said she "started trying to want to do more." He admitted that he "finally broke down and let her touch it" but denied touching her or sexually penetrating her. He said this happened less than ten times. He later clarified that he allowed the victim to touch his penis. He said the incidents would last two to three minutes and denied that he wanted them to happen.

- 6 -

Detective Henry testified that the Defendant had been advised at the September 11 interview that he was free to leave at any time. Detective Henry noted that the Defendant was not restrained and that the Defendant had been seated "closest to the door to emphasize" that the Defendant was free to leave at any time. Detective Henry said that, after speaking with his supervisor following the September 11 interview, he obtained an arrest warrant for the Defendant, who was taken into custody.

The Defendant testified that he had been employed as a correctional officer and, later, as a booking processor with the Davidson County Sheriff's Department. He said he also worked a second job as a "courtesy officer at various locations" for many years. He said he had been in law enforcement for fifteen and one-half years, with a one-year interruption for an injury.

The Defendant testified that he and the victim's mother met in December 2016 and began dating in February or March 2017. He said that they began cohabiting in Summer 2017 in his Nashville home and that her two daughters also lived with them. The Defendant agreed that he, the victim's mother, the victim, and the victim's sister moved to Clarksville in July 2018, and that they married in May 2019.

The Defendant testified that he thought he had a good relationship with the victim and her sister. He described them as "a little wild" at first. He said that he and the victim "used to run around the house and chase each other." He said he sometimes took the victim to school when they lived in Nashville but that he did not take her to school after they moved to Clarksville. He said that he did not start babysitting the victim until 2020 and that he was never alone with the victim or her sister in 2019. He said he never spanked the victim but had disciplined her by taking away her tablet or television privileges.

The Defendant testified that the victim's mother disciplined the victim with spanking and whipping with a belt. He said that the victim sometimes spoke disrespectfully to her mother, who did not always recognize the disrespect. He said that he sometimes pointed out the disrespect to the victim's mother. He described an incident in which the victim acted out in several ways, culminating in the victim's mother telling the victim to take off her clothes, after which the victim's mother whipped the victim with the Defendant's belt. He said he had to intervene and stop the whipping because it reminded him of his childhood. He said that this was the only whipping but that the victim was spanked on other occasions.

The Defendant testified that he sometimes brought the victim and her sister home from school. He said that on one such occasion, he removed his work uniform and sat on the couch in his undershirt and boxers, as was his habit after work. He said he fell asleep and awoke when the victim jumped onto him. He said that his penis came out of his boxers

and that the victim began touching it. He said, "[S]he started rubbing on me and stuff." He later described her actions as "trying to grab on it . . . jacking a little bit and stuff." He demonstrated the motion with his hand and said she made this movement about six to ten times. He said that he pushed her away and that he always wore pants or shorts after this incident. He said that, after this incident, he asked the victim's mother to send the victim to her paternal grandmother's house during the week once "virtual school" began. He said the victim behaved there, whereas the victim did not listen to her mother or her mother's parents. He said he asked the victim why she had touched his penis but did not tell the victim's mother. He said he had been concerned about the victim's harming herself if he told her mother. He said he had told the victim's mother about the missing tablet because it had been missing for five days and the victim's mother had searched extensively for it and had called other relatives to see if it was at their homes.

The Defendant denied that he ever "did it again" after the March 2020 incident and said he never touched the victim. He stated that, despite having said in his interview that there were as many as ten incidents lasting two to three minutes, she only touched his penis once, and he had been asleep when it happened. He explained, "[A] lot of times she would jump on me and she would try to grind down on me and stuff and she would try to touch me, but I would push her off of me and stuff like that." He reiterated, "It was one time that it happened." He agreed that the victim misbehaved frequently and "stayed in trouble." He also agreed that she "would hint towards doing sexual stuff" with him.

The Defendant said he felt bad and had "never wanted to break up the family." He said he thought the victim had acted out because her younger sister and his daughter had received more paternal attention from their respective fathers than the victim. He apologized to the victim and to the court. He acknowledged that he had lied in his interviews but said he was telling the truth in his sworn testimony.

On this evidence, the trial court found the Defendant guilty of each of the six charged counts of aggravated sexual battery. At a sentencing hearing, the court imposed ten-year sentences for each conviction and ordered partially consecutive sentencing, for an effective fifty-year sentence to be served at 100%. This appeal followed.

# I

## Speedy Trial

The Defendant contends that the trial court erred in denying his motion to dismiss based upon an alleged violation of his right to a speedy trial. Approximately three and one-half years elapsed between his arrest and his trial. The State argues that, based upon the facts of this case, the court did not err in denying the motion. We agree with the State.

The United States and Tennessee Constitutions guarantee a criminal defendant the right to a speedy trial. U.S. Const. amend. VI; Tenn. Const. art. 1, § 9. In addition, the right to a speedy trial is guaranteed by statute in Tennessee. *See* T.C.A. § 40-14-101 (2018). The purpose of the right to a speedy trial is to protect a defendant from harm caused by "oppressive pretrial incarceration, anxiety and concern . . ., and the possibility that the accused's defense will be impaired by dimming memories and loss of exculpatory evidence." *Doggett v. United States*, 505 U.S. 647, 654 (1992) (internal quotations marks and citations omitted); *see State v. Utley*, 956 S.W.2d 489, 492 (Tenn. 1997). In determining whether a defendant's right to a speedy trial has been violated, this court considers the length and reasons for the delay, whether a defendant asserted the right, and whether a defendant was prejudiced by the delay. *State v. Bishop*, 493 S.W.2d 81, 83-84 (Tenn. 1973); *see Barker v. Wingo*, 407 U.S. 514 (1972).

A claim that a defendant has been denied his right to a speedy trial involves a mixed question of law and fact. *State v. Moon*, 644 S.W.3d 72, 78 (Tenn. 2022). We conduct a de novo review of a trial court's interpretation and application of the law. *Id.* We afford deference to the trial court's factual findings unless the evidence preponderates against the findings. *Id.*

A review of the pretrial pleadings and proceedings is relevant: The Defendant was arrested by warrant on September 12, 2020, and he received appointed counsel on September 18. He was arraigned in general sessions court on September 14, 2020, and his preliminary hearing was held on September 24, at which time his case was bound over to the grand jury. Although represented by counsel, the Defendant filed a pro se motion for a speedy trial on February 8, 2021. He filed a pro se motion to dismiss on April 12, 2021, on the basis that the State had not filed an indictment within 180 days. The case was heard by the grand jury on April 5, 2021, and an indictment was returned in April 2021, although the record does not reflect the date. Counsel was appointed to represent the Defendant in circuit court, in which the Defendant was arraigned on May 7, 2021. On June 24, 2021, the Defendant filed a pro se motion for appointment of new counsel due to alleged ineffective assistance of counsel, and his counsel responded on July 20, 2021, with a motion to withdraw. The court appointed new counsel on July 29, 2021. The Defendant filed a pro se motion to dismiss on January 18, 2022, and he stated in the motion that his then-current attorney had not responded to his letters and telephone calls or to his mother's calls. Counsel filed a motion to withdraw on February 22, 2022. The court appointed new counsel on March 25, 2022. On August 25, 2022, defense counsel filed a motion to suppress evidence of the Defendant's statements during a post-polygraph interview. A hearing on the motion was scheduled for September 23, 2022, but on September 19, the State moved to continue the hearing due to the unavailability of one of its witnesses due to her parental leave, which was scheduled to end after January 3, 2023. The State also filed a motion to continue the trial, scheduled for November 29, 2022, due to the unavailability

of two witnesses, one of whom was the same witness on parental leave, and the other of whom was a law enforcement officer scheduled for training from November 28, 2022 through December 1. The court continued the suppression hearing and the trial until February 8 and 27, 2023, respectively. The Defendant filed a second pro se speedy trial motion on October 3, 2022, alleging that his previous speedy trial motion was never heard or ruled upon. The court ruled on the suppression motion on February 28, 2023. Three days before the scheduled trial date of March 27, 2023, the Defendant filed a pro se motion to dismiss due to an alleged violation of his right to a speedy trial, and he alleged that his counsel had forfeited his pretrial conference, thereby foreclosing his "opportunity to provide a witness list that is in [his] favor." On the same date, he filed a motion for appointment of new counsel, alleging various actions and inactions of counsel with which he disagreed. On the same date, counsel filed a motion to withdraw. The court appointed new counsel on March 27, 2023. The Defendant filed additional pro se motions to dismiss based upon an alleged violation of his right to a speedy trial on April 6, October 5, and November 10, 2023. Counsel filed a motion to withdraw on November 8, 2023, and the court appointed trial counsel on November 21, 2023. Trial counsel filed a motion to dismiss based upon an alleged violation of the Defendant's right to a speedy trial on January 9, 2024. The Defendant's bench trial was held on March 25, 2024. During the time the Defendant was represented by his various counsel, he filed numerous pro se motions, including for bond reduction, discovery, suppression of evidence, and dismissal.

The trial court conducted a hearing on the motion to dismiss on February 1, 2024, and it made the following findings and conclusions in support of its denial of the motion:

> The Court takes Judicial Notice and incorporates by reference the docket in this matter. The docket is replete with several instances where [the Defendant] had counsel and either he requested that Counsel be relieved and he be appointed new counsel or that counsel had requested that they be allowed to withdraw including -- the Public Defender's Office was initially appointed and they moved to be relieved and Mr. Etson of the Montgomery County Bar was appointed and ultimately moved to withdraw. He was allowed to withdraw and Ms. Taria Blount (phonetic) was appointed by this Court. She was ready to try the case and then there were motions filed, litigated and heard by Ms. Blount. Ultimately, the matter was set for trial based on the dates that the record would show and I want to be sure that I correctly state – Ms. Blount ultimately had to move to withdraw and I believe there was also a motion by this Defendant to have new counsel, so the Court finds that any delays in this matter being set for trial – and Ms. Blount was allowed to withdraw and the Court appointed David Haggard of the Montgomery County Bar and Mr. Haggard did have to withdraw due to his appointment as a Magistrate in this Judicial District. The Court then

appointed Mr. Yow and Mr. Yow has worked diligently to move this matter forward.

The Court finds that based upon the full review of the record, that the majority of any delays in trying this matter are . . . the Defendant's doing for not being able to cooperate with counsel, so the motion to dismiss for violation of his right to a speedy trial is respectfully denied.

As to the motion regarding a due process argument, the Court has before it the allegations contained in the motion, factual allegations. The Court has not been provided any testimony to support those factual allegations and the Court further finds that even if those factual allegations were true, that it would not rise to a level of violation of any due process rights, and the Court respectfully denies that motion.

The record reflects that the length of the delay – approximately three and one-half years from the Defendant's arrest until his trial – was considerable. It exceeded the one-year threshold which is considered sufficient to trigger analysis of the remaining factors. *See Barker*, 407 U.S. at 530; *see also Doggett*, 505 U.S. at 652 n.1; *Bishop*, 493 S.W.2d at 83-85. However, although the length of the delay may support a defendant's claim that he was denied a speedy trial, "this fact alone will [not] support a finding that [a] defendant has been denied his constitutional right to a speedy trial." *Bishop*, 493 S.W.2d at 84. The Defendant asserted his right to a speedy trial, filing a pro se demand for a speedy trial on February 8, 2021, five months after his arrest.

The question of the reasons for the delay is more complex. Our courts recognize four categories of reasons for delays. Delays can be "intentional . . . to gain a tactical advantage over the defense or . . . designed to harass the defendant." *State v. Wood*, 924 S.W.2d 342, 346 (Tenn. 1996). Delays can also result from "bureaucratic indifference or negligence." *Id*. at 346-47. Delays can also be "necessary to the fair and effective prosecution of the case," which results in a "justifiable" delay not weighed against the prosecution or a defendant. *Id*. at 347. Finally, a defendant can "cause[ ], or acquiesce[ ] in" delays, which is weighed against a defendant. *Id*.

The trial court found that the delay was occasioned by the Defendant's consistent dissatisfaction with the attorneys appointed to represent him. The record reflects numerous and repeated pro se filings by the Defendant, despite his representation by a series of attorneys. The record likewise reflects that the Defendant was a mere three days from trial in 2023 when he elected to file a motion to have his counsel replaced, resulting in a further one-year delay. An earlier delay was necessary due to the unavailability of two State's witnesses. In addition, this court takes notice that on March 13, 2020, the Tennessee

Supreme Court suspended in-person court proceedings, which included jury trials, subject to certain exceptions not relevant here. *See In re COVID-19 Pandemic*, No. ADM2020-00428 (Tenn. Mar. 13, 2020) (order). The supreme court lifted the suspension of jury trials, effective following the close of business on March 31, 2021, and subject to the terms of the comprehensive written plan promulgated in each local judicial district for in-person proceedings. *See In re COVID-19 Pandemic*, No. ADM2020-0428 (Tenn. Feb. 12, 2021) (order).

Regarding the question of prejudice to the Defendant due to the delay, our supreme court has stated that prejudice to a defendant is viewed in light of three distinct interests: (1) to "prevent undue and oppressive incarceration prior to trial," (2) to "minimize [the] anxiety and concern accompanying public accusation," and (3) to "limit the possibilities that long delay impairs the ability of the accused to defend himself." *Bishop*, 493 S.W.2d at 85. The court has stated, though, that "[c]ourts do not necessarily require a defendant to affirmatively prove particularized prejudice." *State v. Simmons*, 54 S.W.3d 755, 760 (Tenn. 2001).

The Defendant argues that the trial court failed to analyze the question of prejudice but has articulated no actual prejudice which befell him. We note the Defendant's significant period of pretrial incarceration, from September 12, 2020, until March 25, 2024. The record reflects both that the Defendant was anxious to proceed to trial and that his actions contributed, at least in part, to the delay. The record also reflects that statements were taken from the victim and the Defendant shortly after the offenses, and the victim's trial testimony was largely consistent with her statements in her forensic interview. No witness expressed any significant inability to recall the relevant facts, and the record does not reflect that any other potential evidence was lost due to the passage of time.

On de novo review, we have balanced the factors and conclude that, although the Defendant experienced a lengthy pretrial delay despite his demand for a speedy trial, he significantly contributed to the delay. Additional delay occurred during the suspension of in-person proceedings, which was attributable to neither the Defendant nor the State. Although he was prejudiced in the sense that he was subject to a long pretrial incarceration and the uncertainty of an ultimate outcome, the record fails to reflect that his defense was prejudiced at his trial due to the passage of time. The Defendant has failed to show that the delay rose to the level of a constitutional violation of his right to a speedy trial. He is not entitled to relief on this basis.

## II

## Motion to Suppress

The Defendant contends that the trial court erred in denying his motion to suppress his police statement given after he participated in a polygraph examination. The State responds that the court did not err. We agree with the State.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution protect an individual from being compelled to provide evidence against himself or herself and afford the right to remain silent. *See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 9. If an individual invokes the right to remain silent, police questioning must end. *State v. Climer*, 400 S.W.3d 537, 557 (Tenn. 2013). The invocation, however, of the right to remain silent must be unambiguous and unequivocal. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *State v. Dotson*, 450 S.W.3d 1, 53 (Tenn. 2014).

In the particular situation when a defendant has given a statement following a polygraph examination, such a statement "may be admissible *if* [it is] voluntary in the constitutional sense *and* '*also* [is] consistent with *other* applicable constitutional and evidentiary rules.'" *State v. McCaleb*, 582 S.W.3d 179, 193 (Tenn. 2019) (quoting *State v. Damron*, 151 S.W.3d 510, 518 (Tenn. 2004)) (emphases added).

In determining whether an inculpatory statement has been made voluntarily, "the essential inquiry . . . is whether a suspect's will was overborne so as to render the confession a product of coercion." *Climer*, 400 S.W.3d at 568; *see Dickerson v. United States*, 530 U.S. 428, 433-35 (2000); *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996). The court

determining whether a Defendant's statement is voluntary examines the totality of the circumstances, which requires consideration of "'both the characteristics of the accused and the details of the interrogation.'" *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434); *see Smith*, 933 S.W.2d at 455. This inquiry may include the following circumstances:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep [,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996) (alteration in original) (emphasis omitted) (quoting *People v. Cipriano*, 429 N.W.2d 781, 790 (1988)); *see Climer*, 400 S.W.3d at 568.

The record reflects that the Defendant was first interviewed by the police on September 9, 2020, at which time he denied any wrongdoing. On September 11, he participated in a polygraph examination conducted by a TBI agent, after which he was interviewed by the police again. The Defendant was advised of his *Miranda* rights and chose to waive them. In this interview, the Defendant gave the statement described above.

On the Defendant's suppression motion, the trial court ruled that the video recording of the interview was admissible but that no reference to the polygraph examination could be admitted. The court specifically excluded the portion of the interview in which the polygraph examiner discussed the examination with the Defendant. In its ruling, the court referenced *McCaleb* and *Damron*, finding that the Defendant had voluntarily participated in the interview and concluding that no constitutional deprivation of the Defendant's rights occurred. The court also found that the probative value of the evidence of the interview was not substantially outweighed by the danger of unfair prejudice to the Defendant, thus concluding that the admission of the statement was otherwise consistent with the Rules of Evidence. *See* Tenn. R. Evid. 403; *Climer*, 400 S.W.3d at 568.

Thereafter, at the bench trial, the recording was received as trial evidence, and the polygraph examination was not referenced by witnesses or in the video recording of the September 11, 2020 statement that was played for the trial court.

The Defendant complains on appeal that the trial court failed to conduct an adequate review of the facts and the law, instead ruling in a conclusory manner. The Defendant is correct that the court did not engage in a detailed analysis of the specific facts and circumstances as contemplated by *Huddleston* and *Climer*. However, the Defendant has, himself, failed to explain how "the totality of the circumstances, including characteristics of the accused and details of the interrogation" compel a conclusion that his statement was the involuntary result of unlawful coercion. *See State v. Davidson*, 509 S.W.3d 156, 159 (Tenn. 2016); *see Dickerson*, 530 U.S. at 434; *Climer*, 400 S.W.3d at 568.

The record reflects that the Defendant, age forty-two and a long-time Sheriff's Department employee at the time of the interview, was a high school graduate who attended but did not graduate from college. He came to the scheduled interview voluntarily and was not in custody during it, eliminating any concern about a delay in his being taken promptly before a magistrate. He was advised of his *Miranda* rights and consented to the interview. The recording of the interview showed that the Defendant appeared alert and coherent and did not depict impairment from intoxicants or illness. The Defendant had just participated in a polygraph examination, during which his answers indicated deception, which was discussed with him before he gave the inculpatory statement. No evidence suggests, nor does the Defendant allege, that he was threatened with or subjected to abuse or deprivation of food, drink, or rest during the interview process. The Defendant was familiar with police procedures and environs. The post-polygraph interview lasted less than one hour. *See Climer*, 400 S.W.3d at 568.

Upon review of the totality of the circumstances, we conclude that record does not preponderate against the trial court's determination that the Defendant voluntarily participated in the interview. This finding supports the court's conclusion that the statement was not made in violation of the Defendant's constitutional rights. *See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 9; *McCaleb*, 582 S.W.3d at 193; *Damron*, 151 S.W.3d at 518.

We turn, then, to the question of whether the statement was "'also consistent with *other* applicable constitutional and evidentiary rules.'" *McCaleb*, 582 S.W.3d at 193 (quoting *Damron*, 151 S.W.3d at 518 (emphasis added)). In his motion to suppress and on appeal, the Defendant has not argued that other constitutional rules, other than those attending the voluntariness of confessions, were violated. He argued in this motion to suppress that any probative value of the evidence was substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403. The trial court acknowledged its obligation to weigh the competing considerations and disagreed with the Defendant's argument.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

Clearly, the Defendant's statement was relevant evidence. *See* Tenn. R. Evid. 401, 402; *McCaleb*, 582 S.W.3d at 188. Cognizant of the law excluding evidence of polygraph examinations, the trial court excised any references to the polygraph examination from the trial evidence. *See State v. Pierce*, 138 S.W.3d 820, 826 (Tenn. 2004) (evidence related to polygraph examinations and their results, as well as a defendant's consent or refusal to submit to such examination, is not relevant and therefore is inadmissible pursuant to Tenn. R. Evid. 402). The court concluded that the relevance of the statement, absent references to the polygraph examination, was not substantially outweighed by the danger of unfair prejudice. The record supports its determination. The court did not abuse its discretion in admitting the Defendant's statement as trial evidence.

The Defendant is not entitled to relief on this basis.

## III

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions because the State failed to prove that any touching of the victim or the victim's touching him was intentional and for the purpose of sexual arousal or gratification. The State counters that the evidence is sufficient, and we agree.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility

of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

The Defendant was convicted of six counts of aggravated sexual battery of a child under age thirteen. As relevant to this appeal, "Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: . . . The victim is less than thirteen (13) years of age." T.C.A. § 39-13-504 (2018) (subsequently amended).

> "Sexual contact" includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]

*Id.* § 39-13-501 (2025).

The trial court made findings of fact as to each count. For Count 1, the trial court found that the Defendant "took his hands and guided his [sic] hands on the bare skin of his penis while his pants were partially down, took the victim's hand to accomplish that and also, the Defendant touched the victim's vagina on top of her underwear at that point."

For Count 2, the trial court found "that acts occurred in the victim's bedroom that involved the Defendant placing an oily substance, for lack of a better term, baby oil and touched the buttocks of the victim and also the Defendant tried to get the victim to take her shirt off[.]"

For Count 3, the trial court found that "in the Summer of 2020, in the victim's little sister's bedroom, while the victim was seated on the bed that the Defendant touched the clothing over the victim's vagina[.]"

For Count 4, the trial court found that "sometime in the Summer of 2020 within the time period alleged in the indictment, in the victim's bedroom, the Defendant touched the victim's vagina – touched the underwear on top of the victim's vagina."

For Count 5, the trial court found that "in January of 2020, the Defendant guided the hand of the victim to touch his penis[.]"

For Count 6, the trial court found that "in December of 2019, sometime during the Christmas break in the master bedroom of the home, the Defendant guided the hand of the victim to touch his penis[.]"

The trial court also made general findings of fact applicable to all of the offenses. The court found that the victim was less than age thirteen when each act occurred, that the Defendant's conduct had been intentional, that each touching constituted unlawful sexual contact, and that "based upon the testimony, . . . all these acts of the Defendant could be – beyond a reasonable doubt, would be reasonably construed as being for the purpose for sexual arousal or gratification."

Viewed in the light most favorable to the State, the evidence reflects that the victim was ages ten and eleven at the time of the offenses. She testified about six distinct incidents in which the Defendant touched her intimate parts or she touched the Defendant's intimate parts at his insistence. The Defendant's statement corroborates the occurrence of these incidents. He specifically acknowledged the incident which occurred a few days before he gave his statement, and he further acknowledged that "less than ten" incidents occurred.

With regard to the Defendant's argument that the proof is insufficient to support the sexual arousal or gratification element, we observe that this element is often proven by circumstantial evidence. *See, e.g.*, *State v. Hayes*, 899 S.W.2d 175, 180 (Tenn. Crim. App. 1995). The language of the statute is noteworthy, specifying that the "intentional touching *can be reasonably construed* as being for the purpose of sexual arousal or gratification[.]" T.C.A. § 39-13-501 (emphasis added).

Again viewing the evidence in the light most favorable to the State, the circumstances of the offenses demonstrate that the Defendant, on some occasions, touched the victim's bare buttocks, her vaginal area over her underwear, her vaginal area over her clothing, and tried to get her to remove her shirt. He guided the victim's hand on his bare penis. On some occasions, more than one of these acts occurred. The Defendant perpetrated these acts when he was alone with the victim and her mother was away. A rational trier of fact could reasonably construe this evidence as proof beyond a reasonable doubt that the Defendant intentionally touched the victim or caused the victim to touch him

for the purpose of sexual arousal or gratification.  The evidence is sufficient to support the convictions.

The Defendant is not entitled to relief on this basis.

**IV**

**Sentencing**

Finally, the Defendant contends that the trial court erred in imposing sentences above the statutory minimum for each offense and by ordering partially consecutive sentencing.  The State counters that the Defendant has failed to demonstrate that the trial court abused its discretion in sentencing him.  We agree with the State.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'"  *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012).  A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, the potential for rehabilitation or treatment, and the result of the validated risk and needs assessment.  T.C.A. §§ 40-35-103 (2025), -210 (2025); *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2025).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act."  *Bise*, 380 S.W.3d at 707.  "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005."  *Id*. at 706.  "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal.  *Id*.

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences.  *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013).  A trial court has broad discretion in determining whether to impose consecutive

service. *Id.* A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(8) (2018) (subsequently amended). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2025); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

At the sentencing hearing the State offered the presentence report as an exhibit. The report reflected that the then-forty-five-year-old Defendant, a high school graduate who had attended some college, had no history of criminal convictions. He reported excellent mental health, fair-to-good physical health, and no substance use issues. His employment history included fifteen years as a correctional officer and booking processor with the Davidson County Sheriff's Department. He was the biological father of one minor child, a daughter. His risk and needs assessment score for risk was "low with high or moderate needs for education or family."

The victim testified that she had prepared a written statement when she was much younger, which reflected that she had suffered family disruption, mistrust of men, trouble in school, and social anxiety as a result of the offenses. Her written statement was received as an exhibit. The victim stated that she was unable to be around men for long periods, that she sought validation in "weird ways," and that she did not like being in public because she thought people were looking at her and that she was "hideous." She said she had been participating in twice-weekly counseling since 2020, and she identified her case manager, who was in the courtroom. She said she felt like the Defendant had ruined her life and that she would be more stable if the offenses had not occurred. She said she had trouble sleeping because of the offenses.

The victim's mother was called as a witness and read a prepared statement, in which she said her trust in the Defendant had been misplaced. She noted that the Defendant had been twelve years older than she was and that she had been a young single mother when they met and married. She expressed her concern that the victim faced a lifetime of being burdened by the Defendant's offenses. She said he exploited a position of trust.

The Defendant's former girlfriend testified on his behalf. She stated that, until the Defendant's incarceration, they had successfully co-parented their daughter. She said she thought the Defendant was the type of person who would comply with the terms of the sexual offender registry, would learn from his mistakes, and would not be a danger to society. She said she would not permit the Defendant to be around their daughter without supervision.

- 20 -

The Defendant testified that he had saved the life of a suicidal inmate during his employment as a correctional officer. He said he had not been "in any criminal trouble" before the present case. He said that, upon his eventual release from incarceration, he would comply with the terms of the sexual offender registry and community supervision for life. In a written statement, which was received as an exhibit, the Defendant apologized to the victim and her family and expressed his desire to be a better "Christian, Dad and son in the future." He asked the trial court to show "mercy on" him in sentencing.

The Defendant, a Range I offender,[1] faced individual sentences of eight to twelve years for each of his six convictions. *See* T.C.A. §§ 39-13-504(b) (classifying aggravated sexual battery as a Class B felony), 40-35-112(a)(2) (Range I sentence for a Class B felony is eight to twelve years).

The trial court noted its consideration of the statutory principles of sentencing, the evidence received at the trial and sentencing hearing, the presentence report, the arguments of counsel, the nature and characteristics of the criminal conduct involved, the information offered by the parties relative to the mitigating and enhancement factors, statistical information compiled by the Administrative Office of the Courts as to sentences in other cases relative to the sentences imposed in similar cases.

The trial court found that the sentences should be enhanced based upon the Defendant's violation of a position of private trust, relying on the evidence that the Defendant was the victim's stepfather. *See id.* § 40-35-114(14) (2018) (subsequently amended). The court declined to apply the Defendant's proposed mitigating factor related to an offense which neither caused nor threatened serious bodily injury. *See id.* § 40-35-113(1) (2025). The court found that although no serious bodily injury occurred, the Defendant's conduct threatened such. The court also declined to apply the "catchall" mitigating factor based upon the Defendant's agreement to a bench trial. *See id.* at (13). The court noted the length of time the case had been pending.

Considering the enhancement factor and noting the facts of the offenses that the Defendant had failed to accept responsibility by blaming the victim, the court found that the midpoint in the sentencing range, ten years, was the appropriate sentence for each of the six offenses.

---

[1] The Defendant's range classification is governed by the law in effect at the time of the offenses, which provided for Range I classification based upon his lack of prior felony convictions. The statute currently provides, in pertinent part, for baseline sentencing as a Range II offender if the victim is below age eighteen. *Compare* T.C.A. § 39-13-504(b)(2) (2025) (current law) *with id.* at (b) (2018) (subsequently amended) (prior law).

The Defendant conclusory states in his brief, "A more appropriate sentence considering all of the circumstances would have been the statutory minimum of 8 years on each count ordered to be served concurrently." He argues generally that the trial court "failed to adequately consider" his lack of a criminal history and his prospects for rehabilitation, but he has not explained how the court incorrectly applied the enhancement factor upon which it relied and declined to apply any mitigating factors. *See Bise*, 380 S.W.3d at 708.

The record reflects that the trial court thoughtfully considered the facts and circumstances of the case, the relevant considerations, and the applicable law. It made findings of fact on the record and explained its rationale. Its determination as to the length of the sentences is entitled to the presumption of reasonableness. Upon review, we conclude that the court did not abuse its discretion in imposing midrange sentences. The court was influenced by the Defendant's position of private trust as the victim's stepfather and his abdication of responsibility for the offenses. The Defendant has failed to show that the court abused its discretion in imposing ten-year sentences.

Turning to the question of whether consecutive sentencing was appropriate, the trial court found by a preponderance of the evidence that the following factor applied:

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

T.C.A. § 40-35-115(b)(5). The court explained its reasoning:

> First of all, based upon the testimony of [the victim], the Court finds that there is extensive residual mental issues that she is dealing with and the Court finds based upon her testimony that that portion of the consideration applies.
>
> The nature and scope of the sexual acts. The Court must consider that. The Court placed on the record at the conclusion of the bench trial, that these are six separate acts occurring on six different times and the Court made its findings and the Court finds that based upon the nature and the scope of this activity, that it would support consecutive sentencing. The time span of the undetected sexual activity, these events occurred at the earliest of December

- 22 -

of 2019 and continued at least through August of 2020, that factor would support the imposition of consecutive sentencing.

Aggravating circumstances arising from a relationship between the Defendant and the victim, [the Defendant] assumed the stepparent role and so the Court finds that that portion of the factor applies and then of course, he has been convicted of six counts of sexual battery so the Court finds that there are two or more statutory offenses of sexual abuse of a minor.

Considering all of that, considering all the sentences issued in other cases, the Court finds that a ten[-]year sentence in each count. Counts one through five will run consecutive to each other; Count six will run concurrent with count one for an effective fifty-year sentence. Again, the Court imposes a community supervision for life, sex offender registry for life.

The Defendant argues that the trial court abused its discretion in imposing partially consecutive sentences because it failed to consider the Defendant's lack of a criminal history, his low risk score on the assessment tool, and his ability to be rehabilitated. Essentially, the Defendant invites this court to reweigh the relevant facts and circumstances and sentence the Defendant de novo. Mindful of our standard of review – abuse of discretion with a presumption of reasonableness – we decline to run afoul of established precedent. *See Pollard*, 432 S.W.3d at 859.

The record reflects that the trial court considered the relevant facts and circumstances and the consecutive sentencing statute and broader sentencing laws. Its decision is entitled to the presumption of reasonableness. *See id.* Viewed through that lens, we conclude that no abuse of discretion has been shown. The Defendant engaged in a series of unlawful sexual acts toward his stepdaughter, with whose care he had been entrusted in her mother's absence at the times of each offense. At least some of the offenses were occasioned by purported punishment for the victim's childhood behavior. The offenses occurred over a span of approximately nine months and were punctuated only when the victim revealed the Defendant's actions to family members. The court's consideration of the multiplicity of the offenses, the time span of the crimes, and the nature of the relationship between the Defendant and the victim reflect its consideration of an overall sentence that was "no greater than deserved" and "the least severe measure necessary to achieve the purposes for which the sentence [was] imposed." *See* T.C.A. § 40-35-103(2), (4). The Defendant is not entitled to relief on this basis.

As a matter of plain error, we note that the judgment for Count 6 contains a clerical error. It reflects an offense date of "01-01-20 to 09-04-20," but the indictment for Count 6 was amended by agreement to encompass the date December 1, 2019 to September 4, 2020. The case is remanded for correction of this clerical error. *See* Tenn. R. Crim. P. 36.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed. The case is remanded for correction of the judgment in Count 6.

**s/ Robert H. Montgomery, Jr.**
ROBERT H. MONTGOMERY, JR., JUDGE